JOHN LANE *vs.* WILLIAM H. SMITH.

Penobscot. Decided April 10, 1878.

*Contract.*

The defendant subscribed for shares in a patent right, to be held by him without payment therefor, otherwise than by inducing others to subscribe for shares and give their notes therefor for greatly more than the value of the shares; the notes afterwards came into his hands by purchase, and were by him negotiated for money and paid by the makers. *Held*, that these facts would not entitle the makers to maintain an action against him for money had and received.

ON REPORT.

ASSUMPSIT, for money had and received, and on account annexed, as follows : " 1875. September 20. To cash received by you, as proceeds of my note, given for an interest in the Abel Loom Corporation, the note having been obtained by fraud, and discounted by you at Eastern bank, and you having received the money therefor. Also, for cash paid for costs and expenses in defending suit on said note, in favor of Amos M. Roberts, with interest on all said sums to date, $1500."

The case on the note is stated in *Roberts* v. *Lane*, 64 Maine, 108.

The conclusions of fact upon which the decision is based are briefly stated in the opinion.

*A. W. Paine*, with whom was *A. Sanborn*, for the plaintiff, gives his version of the facts thus : One Shaw, representing the ownership of a patent right of little or no practical value, connived with different persons in Bangor and vicinity, of which the defendant was one, to place it on the market for the purpose of gain. In order to promote the object, an agreement was made between Shaw, the defendant and others named, whereby the property should be put up for sale as stock in an incorporated company to be organized, by the name of the Bangor Abel Loom Company, at the exorbitant price of $50,000, the sum to be actually paid being only about one-half that sum. As an inducement to persons to take stock at that rate, besides the presenta-

tion of the machine under the most favorable circumstances, these promoters agreed to sign the stock subscription liberally, and thus afford false inducement for others under the pretense that they had confidence in the machine; it being understood secretly by all these confederates that these subscriptions should be canceled as soon as the object was accomplished; and they were so, in fact.

In accordance with this plan, a stock subscription was started, and the signatures of the confederates to the amount of $16,000 were made, all of which were to be canceled. Subsequent subscriptions were made, mostly by the same parties, for some $8,000 more, when the plaintiff, relying upon the fairness of the transaction and confiding in the judgment and acts of the subscribers solely, was induced to sign for $1000.

Afterwards the subscription was filled and notes were taken. The last subscriber thus to settle was the plaintiff, to whom was presented the pocket-book full of notes made by the other subscribers, with the assurance that all had thus settled.

The note given by the plaintiff was by the form of sale passed to the defendant, one of the promoters, who sold it to Roberts, and received the cash as for a good note, subject only to the ordinary rate of discount. To this fact attaches the plaintiff's cause of action for money had and received for his note, illegally and by false pretense obtained.

*W. H. McCrillis*, with whom was *A. L. Simpson*, for the defendant, said, in substance, that the plaintiff subscribed on his own judgment or disposition to take a risk, and was not induced by the plaintiff; he saw the machine in operation, turning out excellent and beautifully woven cloth; there was no evidence of any inducements held out by the defendant to the plaintiff, or of any conversation between them; that, in fact, the defendant was disappointed as well as he; that the machine, though capable under favorable circumstances of doing good work, had not yet been made available in factories; that, even if there were fraudulent representations, the plaintiff was not in a position to recover, not having rescinded or returned the shares.

DICKERSON, J. This is an action of assumpsit to recover of the defendant the proceeds of the plaintiff's promissory note, payable to his order, indorsed by him in blank and given in payment of his subscription for ten shares in the purchase of the patents of the Maine Abel Loom Company, at one hundred dollars a share. The alleged ground of recovery is that the note was obtained by fraud and discounted by the defendant at the Eastern Bank in Bangor.

If the action is maintainable, it is upon the count for money had and received; and we think that it is not maintainable upon that count, as the evidence fails to connect the defendant, either with the plaintiff's subscription for stock, or his giving his note in payment therefor, in such a way as to make him a party to the fraud, if any there was, in either of these respects.

There is not a scintilla of evidence that the plaintiff had any conversation with the defendant in respect to the purchase or payment of stock in the Abel Loom Company; nor does it appear that he requested or authorized any one to confer with or make representations to the plaintiff upon that subject. The plaintiff testifies that all his negotiations were conducted with Shaw, the agent of the loom company. His language is, " I signed the subscription paper from the representation that was made to me by Shaw at the time, and having the list shown me of the subscribers; . . . I should not have signed it if it had not been for Jewett's and Smith's names on it." The defendant is not liable for the representations made by Shaw, as agent of the loom company; and this testimony of the plaintiff, therefore, negatives the defendant's participation in the plaintiff's negotiations for the purchase or payment of the stock in controversy.

But the plaintiff claims to hold the defendant responsible for his original engagement with the Abel Loom Company to pay for his shares in services and influence, and for his pretended conspiracy with others to hold out by the terms of subscription to the subscribers that the price of the patents to be purchased was $50,000, and that the subscribers were to stand upon the same footing, *pro rata;* whereas, the real cost of the purchase was only about half of the sum named, and fifty per cent of the shares was sub-

scribed for fictitiously and in bad faith, upon the express understanding with the vendors that such subscribers should have their shares substantially without charge.

The obvious answer to the first of these alleged grounds of recovery is, that it was perfectly competent for the parties to make the contract complained of; and as it does not appear that the defendant, in fulfilling his part with the loom company, conducted fraudulently or illegally, he cannot be held liable on this ground. Upon the second alleged ground of the defendant's liability, the evidence fails to show the defendant's knowledge or participation in the purpose or transaction therein set forth. It does not appear that he had any knowledge of any agreement between Shaw and Jewett and Leavitt and others, inconsistent with the tenor of the subscription ; he, therefore, is not liable on account of any such agreement.

The purchase of the plaintiff's note and other notes given for the patents is relied upon in the argument as a badge of fraud. This argument, however, ceases to have any legitimate force when it is considered that the evidence shows that that purchase had no connection whatever with, and was entirely independent of, the defendant's subscription, or the payment and cancelling thereof.

The defendant, as a prior signer of the agreement, whatever may have been his reputed sagacity and wealth, did not thereby guarantee the novelty of the invention or the value of the patents to the subsequent subscribers. The plaintiff had the same opportunity for determining these questions as the defendant. The machine was on public exhibition in Bangor, weaving cloth, several days before the plaintiff subscribed ; he repeatedly witnessed its practical operations, and if he chose to subscribe upon the faith of Shaw's representations and Jewett's and Smith's names, rather than upon his own judgment, he alone must abide the consequences ; it was a risk of his own seeking, not Smith's.

As now presented, the evidence fails to show that the defendant made any false or fraudulent representations, used any false pretenses, or engaged in any conspiracy, whereby the plaintiff was induced to agree to take stock in the proposed purchase of the Abel Loom patents, or to give his note in payment thereof.

The defendant bought the plaintiff's note in the market, duly indorsed by him, for value, and we do not perceive any valid ground for denying to him the rights and remedies that appertain to a *bona fide* holder of a promissory note for value.

*Plaintiff nonsuit.*

APPLETON, C. J., DANFORTH, VIRGIN and LIBBEY, JJ., concurred in the result.

DANFORTH, J. I concur in the result of the opinion in this case that this action cannot be maintained. If at all, it can only be for money had and received. But the defendant has had none of the plaintiff's money or its equivalent. Whatever might have been his instrumentality in causing the plaintiff to give his note or his liability, if any, in a proper form of action, the note did not come into his hands as the direct proximate result of his fraud, if there was any. The note was given to another person, who in this transaction was not acting for or as the agent of the defendant. On the other hand, the defendant procured the note and paid for it a fair consideration. Legally, then, he purchased the note by honest purchase and not by fraud. If the note had been sold to another person it would hardly be contended that the defendant would be liable in this form of action.

LIBBEY, J. I concur in the result in this case on two grounds. I. On the ground stated by Judge Danforth in his note. II. The plaintiff, by his subscription to the stock of the association, became owner of an interest in the patent which was conveyed to the use of the subscribers. If he was induced to subscribe and pay his money by fraud, his subscription was not valid, but voidable only by him. He might elect to hold the benefits of his purchase or to rescind the contract. To rescind, he must tender back what he had received. The evidence does not show that it was of no value. He can maintain an action for money had and received only by rescinding the contract.

But I cannot concur in the opinion to the extent to which I understand it to go. I think the evidence authorizes the conclusion that the defendant agreed with Shaw to subscribe for stock,

and to authorize Shaw to hold him out to the public as a subscriber paying into the capital of the company his subscription, for the purpose of inducing others to subscribe, under a secret agreement that he should have his stock without payment therefor. I think such an arrangement, by which the defendant was to act as a decoy, was fraudulent as to parties induced to subscribe by it. He authorized the assertion of a matter as fact, which he knew to be false, to induce others to act.

The fact that he had subscribed in good faith was not immaterial to others subscribing after him. It was an assertion that if others subscribed and became members of the company, they would share the benefits of his subscription, as a part of the capital of the company. By having his stock without payment, the stock of other subscribers was made less valuable than they had a right to expect it to be.